### TILLMORE *v.* MOORE, Owner, and another.

*(District Court, D. Maryland.* November 8, 1880 )

1. **LIBEL—PARENT—ABDUCTION OF SON.**—A parent may maintain a libel in admiralty for the wrongful abduction and carrying to sea of a son.

2. **TORT—MASTER—SHIP-OWNER.**—A ship-owner is liable for such tort of the master, where the master is in command of the vessel as the agent of the owner.

3. **ABDUCTION—DAMAGES.**—*Held,* under the circumstances of this case, that the owner of the ship was not liable, but that the master was answerable in the sum of $150 to the mother of the minor for the abduction of her son.

In Admirality. Libel *in personam.*

*Applegarth & Hagner,* for libellant.

*I. A. L. McClure,* for respondents.

MORRIS, D. J. This is a cause of damage brought by the libellant against the owner and master of the schooner Thomas W. Moore, for damages for the abduction and illtreatment of her son, Henry Johnson, a youth of about 16 years of age.

The libel alleges that libellant is the only surviving parent of her said son, and entitled to his services and wages, and to have care and custody of him; that about September 26,

1879, her son was shipped on board said schooner, (then employed in dredging for oysters in the Chesapeake bay,) without her knowledge or consent, and detained in said employment until the eighth of March following; that her son was, during that time, exposed to the rigor of a severe winter, endured great hardships, was frequently beaten and cruelly treated by said master, and allowed to suffer for want of proper food and medicines, and that when discharged he was badly frost-bitten and sick, and is still disabled from work; that, in consequence, libellant was put to expense for his cure and medical treatment, and is still deprived of his earnings, and is advised that he will never completely recover his ability to labor.

The libellant is a colored woman, living in Washington, and the proof shows that her son, when shipped on respondent's vessel, was about 16 years of age, and was living with his mother, and gave to her whatever he earned at any work he could get to do. It appears that he, together with several other colored boys, were induced by a colored man in Washington to leave their homes and come with him to Baltimore, and were there taken by him to the office of a man who procures seamen for oyster vessels, where, the respondent Lewis being present, they signed shipping articles to serve Lewis during the oyster season at seven dollars per month on any vessel he should designate. They received seven dollars apiece advance, which was taken by the man who shipped them, and then they went at once aboard the schooner Thomas W. Moore and proceeded down the bay on her, the respondent Lewis being master in command. Lewis employed the schooner in connection with two other oyster vessels on the Chesapeake, each taking its turn to bring the whole catch of oysters to Baltimore, and the other two remaining to continue dredging. Johnson, the libellant's son, was transferred from one of these three boats to another during the whole oyster season, and did not get back to Baltimore for some five months after he was shipped. He then at once returned to his mother in Washington. She had known nothing of his intention to leave his home, and, having been unable to learn

anything about him, had suffered great anxiety, and had given him up for dead. His feet and hands were badly frost-bitten, and he had a severe cold. His mother was obliged to nurse him and have a physician attend him for about two months, and at the time of the hearing (September, 1880,) he had not entirely recovered his strength, and was somewhat crippled in his feet.

That a parent may maintain a libel in admiralty for the wrongful abduction of his son and carrying him to sea is well settled; and also that for such a tort committed by the master the ship-owner would be liable as well as the master, if the master was in command of the vessel as his agent; but where the master is owner *pro hac vice*, and not commanding the vessel as agent for the owners, they are not in such cases held personally liable for his torts.

I find that in this case the master had the possession, control, and management of the vessel, and was to man and victual her. He paid, as hire to the owner, a proportion of her gross earnings, but the owner had no control over her employment. So they both testify, and that the owner's share of the vessel's earnings were usually deposited for him by the master with a merchant in Baltimore, and that for months at a time he knew nothing of the vessel's whereabouts, and that he knew nothing of the shipping of this boy. I think, therefore, that, as against the owner, the libel must be dismissed.

I come, then, to consider the merits of the case against Captain Lewis, the master. Looking at all the testimony in the light most favorable to him, and giving him the benefit wherever there is any conflict of testimony, there is no doubt in my mind that he is shown to have knowingly committed a wrong against the libellant, for which he must respond in damages.

The boy, Johnson, claims that he stated in Captain Lewis' presence, in the shipping office, that he was under 21 years of age. Captain Lewis denies this, and swears that the first he knew of it was when Johnson told him he was under age after he had been two days on board, and that Johnson then

said that the men who shipped him persuaded him to say he was 21, and told him he would get more wages if he would say so.

I think that in this Captain Lewis has told the truth, and I am not all disposed to think he would have taken the boy if he had said, in the shipping office, that he was only 16; but, conceding this to be so, and also that there was nothing in the boy's appearance that should have suggested inquiry, by his own admission he had notice of this boy's age two days after they sailed. Johnson says that at that time he told the captain how he had run away from home, and that he wanted to write to his mother and to return to her. The captain could not have at once returned him; but the testimony shows that at least every two weeks one of these three vessels, which were oystering together, came up to Baltimore.

The captain not only did not return him, but kept him for five months, requiring him to work, first on one boat and then on another, at labor of the hardest kind, subject to great exposure, during all the winter months. He paid no attention to the request of the boy to be allowed to return home. He made no inquiry to see if his statements were true, and he allowed the mother to remain in ignorance with regard to her son, and a prey to prolonged anxiety.

Continuous service on an oyster vessel in the Chesapeake, during the winter months, involves labor and exposure which hardy adults are none too able to endure, and no contract requiring it should be made except with those who fully comprehend what they are undertaking. To keep such a youth as Johnson, unused to exposure and hard labor, for five months in such service, was to risk his health and his ability during the rest of his life to earn his living by labor. I throw out of consideration all Johnson's allegations of constant beatings and of insufficient food. His testimony in these matters is not supported by any other witness and is contradicted by several. He had never before been on a vessel, and I have no doubt that his natural slowness and want of familiarity with the duties expected of him brought upon him

some rough treatment, which he has exaggerated, and in this action, except for wrongs the consequence of which have resulted in pecuniary loss to the mother, no recovery can be had. The testimony of the libellant and the physician who treated Johnson establish that he returned home badly crippled with frost-bitten feet and hands, and suffering the effects of a very severe cold, all the result of exposure, and that he required careful nursing and treatment for two months, and six months afterwards, at the time of the hearing, was not entirely well. It also appears that of the seven dollars a month he was to receive the seven dollars advance went to the men who procured him for shipment, and nearly all the balance was retained by the master to pay for the necessary clothing supplied to him during the winter, so that when he was discharged there was coming to him in money only $3.75. He brought none home with him.

The pecuniary loss to the mother has been the expense and labor she has been put to in curing her son of the sickness brought on by his exposure, and the loss of his earnings and services consequent upon his abduction and subsequent disabilities.

As all the parties concerned are in very humble circumstances, it is not my purpose to award any large sum as damages. A large sum would more than compensate the mother for actual pecuniary loss, and would probably be ruinous to the respondent. Under all the circumstances I think $150 the proper sum to be allowed.